# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LabChem, Inc. | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) 2:09cv1128<br>) Electronic Filing |
| Reagents, Inc., et al. | )<br>) |
| Defendants. | )<br>) |

## **OPINION**

Plaintiff commenced this action seeking injunctive relief for an alleged breach of contract. Presently before the court is plaintiff's motion for preliminary injunction. A hearing was held on March 8, 2010, wherein each side presented witnesses and exhibits. The matter is ripe for adjudication. For the reasons set forth below, the motion will be denied.

The record contains the background that follows. Defendants Reagents, Inc., and C.W. Holdings of Charlotte, LLC, are North Carolina companies that entered into negotiations with plaintiff, LabChem, Inc., a Pennsylvania corporation, regarding plaintiff's purchase of the assets of Reagents and C.W. Holdings, which included the sale of a parcel of commercial real estate. Alexander Beranak, Chief of Board of Directors for plaintiff, discussed merging LabChem and Reagents with Charles Waits, the owner of Reagents and C.W. Holdings, in late 2007 and into 2008. Negotiations were ongoing. In September of 2008 Waits advised that he wanted to put things on hold and revisit the negotiations in a year. Waits passed away unexpectedly in December of 2008. Thereafter, William Garnett was hired by Waits' estate to negotiate the sale of the Waits' companies. Garnett telephoned Beranek in early 2009 and inquired about negotiating a sale of the companies to plaintiff, and the parties entered into a confidentiality agreement in February 2009.

Over approximately a two month period the parties negotiated the principal terms that would govern the sale. At the end of this initial process Waits' estate, which held the real estate and assets of both companies, mailed a document entitled "Reagents, Incorporated & C.W.

Holdings, Term Sheet, Sale of Business and Manufacturing Facility Principal Terms and Conditions" ("Term Sheet") to plaintiff. The Term Sheet was executed by the parties on May 7, 2009.

The Term Sheet indicated the entire transaction would be consummated for $4.3 million. Plaintiff would purchase all of the assets of Reagents and C.W. Holdings for $2.3 million. Plaintiff was to provide "$1.25 million at closing and $1.05 million over six years and one month against a Seller Note." Term Sheet at 1, Plaintiff's Exhibit 1 (electronically available at Doc. No. 8-1). The Term Sheet further provided that plaintiff would pay $2 million at closing for the "…real estate owned and controlled by Reagents, Inc. and C.W. Holdings[.]" Id. It also provided that an appraisal of the real estate would be completed and if the appraisal were to come in between $2 million and $2.1 million, then the purchase price would be adjusted upward by fifty percent of the value above $2 million, but the adjustment could not exceed $50,000.00 Id.

The Term Sheet referenced a seller note to be provided by defendants that would require plaintiff to pay $1.05 million in 73 monthly installments. Id. The same provision also stated that "[t]he Seller Note will be subordinated to any bank debt financing needed to consummate the transaction." Id. A detailed payment schedule was attached to the Term Sheet specifying the principal and interest to be paid to defendants.

The Term Sheet also stated:

> Buyer and Seller will enter into a Purchase Agreement…reflecting the Principal Terms and Conditions of this Agreement…and any additional requirements for a transaction of this nature based upon the results of due diligence ... as mutually agreed to by Buyer and Seller.

Id. at 2. Plaintiff had 60 days to perform due diligence and declare the ability to close. Id. It also was required to identify any material condition that would prevent it from closing within that same period. Id. Additionally, plaintiff was required to deposit $300,000 with an escrow agent. Id.

In the weeks that followed the parties began negotiating the terms of a final asset purchase agreement. Matters to be finalized included warranties, indemnifications, insurance coverages, procedures for accounting, inventory, receivables and taxes, and so forth. Defendants sent the first draft of an asset purchase agreement on May 28, 2009. Thereafter, at least six asset purchase agreements were exchanged, but the parties never reached final agreement on one.

Defendants submitted the first draft of an asset purchase agreement to plaintiff on May 28, 2009. Plaintiff returned its counter-proposed agreement on June 4, 2009. It contained several pages of additional terms and conditions inserted throughout the document. See Defendant's Exhibit 3 (redline version of June 4, 2009, counter-proposal). Among other areas, the June 4, 2009, counter-proposal changed the name of the purchaser, modified the terms of the seller note to permit prepayment with only a penalty equal to the interest that would have been earned had prepayment not occurred, permitted plaintiff to offset any claims of indemnity against the note, sought to limit the insurance plaintiff was required to maintain for defendant's benefit, and expanded defendants' indemnity obligations. On June 19, 2009, the attorney for the estate, Robert Gunst, submitted revisions to the June 4, 2009, version which were also extensive. The revisions included provisions making $100,000 of the $300,000 placed in escrow "hard" money that would be retained by the sellers in the event closing did not occur, making time of the essence, making taxes prorated, and changing/adding additional terms in the areas of indemnification and assignment of the rights to indemnification.

Plaintiff seemingly performed all of its obligations under the Term Sheet, including depositing the $300,000 into escrow, performing the real estate appraisal, conducting environmental assessments and obtaining third-party financing to cover the transaction. Plaintiff incurred approximately $150,000 in due diligence costs, which included analysis of defendants' operations. The real estate appraisal was completed on June 26, 2009, and the results were sent to defendants on July 10, 2009. That appraisal revealed that the real estate was in fact worth $2.33 million, not $2 million as the parties originally assumed. Garnett testified that defendants

were pleased with the appraisal because the purchase price would be adjusted upward by $50,000.

Plaintiff's bank submitted a mark-up of the June 19, 2009, asset purchase agreement, deed of trust and balloon note on July 6, 2009, which was forwarded to defendants on July 7, 2009. This version contained proposed changes and additional terms and introduced a number of new documents as part of the transaction. Included in the changes was a provision in the Balloon Note that indicated it would be governed by an inter-creditor agreement that would be required by the bank. Garnett requested a copy of the inter-creditor agreement and received a copy of it on July 9, 2009. It also came to light that the bank was providing financing well beyond the scope of the transaction outlined in the Term Sheet.

After reviewing the inter-creditor agreement with Gunst, Garnett sent an email to plaintiff's counsel on July 13, 2009 requesting a three-way call between plaintiff's counsel, Garnett and plaintiff's bank over several aspects of the transaction and proposed inter-creditor agreement that were unacceptable to defendants. Specifically, Garnett noted that the inter-creditor agreement was a "deal breaker . . . the way it [was] written" because it removed "virtually all rights to the Estate to their notes until after Plaintiff pays back all money to [First National Bank]." Garnett email of Monday, July 13, 2009, Defendant's Exhibit 13. He also advised that there were a number of other provisions that needed to be discussed to bring the rights of the parties in line with the Term Sheet. Defendants subsequently identified as material deviations the provisions in the promissory note, deed of trust and inter-creditor agreement 1) making them subject to and governed by the law of Pennsylvania, 2) requiring defendants to waive any right to jury trial, 3) establishing exclusive jurisdiction in Pennsylvania, and 4) permitting the senior creditor (plaintiff's bank) to modify or increase the amount of the senior debt without regard to the consequences on the junior creditor (defendants). Inter-creditor Agreement at ¶¶ 14, 23, 24, 24(b).

The next day representatives for defendants, plaintiff and plaintiff's bank had a conference call during which defendants reiterated that they had significant reservations about the provisions in the inter-creditor agreement. These concerns were heightened after it came to light that the amount of the loan being obtained and to which defendants' seller note would be subordinated was $4.5 million. Defendants advised plaintiff that obtaining financing in this amount was unacceptable. During the course of the discussions with the bank's counsel wherein defendants' representative expressed these concerns, the bank's counsel recited the "golden rule" – which was relayed as "the bank has the gold and makes the rules."

On July 21, 2009, counsel handling the closing for defendants sent an email to plaintiff's counsel explaining the implications of the inter-creditor agreement and related bank documents on defendants' rights as secured creditors under North Carolina law and advancing a framework for proceeding, which admittedly was a "substantial change in the framework of the transaction." Plaintiff's Exhibit 8. Specifically, it was noted that defendants' secured status would be secondary to a $4.5 million loan and in the event LabChem defaulted on the seller note, defendants' sole remedy would be to take the property back through foreclosure, and if the bank were to foreclose, defendants would have to be the highest bidder. If not, they would not only lose the ability to claim secured lien status, but would also be prevented from becoming an unsecured creditor. Given this state of affairs counsel proposed moving forward with unsecured seller financing and the removal of the subordination and inter-creditor agreements along with a number of other provisions.

On August 4, 2009, Gunst sent an email in response to plaintiff's counsel's August 3, 2009, request for defendants' specific objections to the inter-creditor agreement "as well as other deviations from the Term Sheet." Defendants' Exhibit A to Brief in Support of Motion to Dismiss (Doc. No. 13-3) at 10. Gunst pointed out that the most recent proposal by defendants provided nine changes "which could have bridged the divide" but that plaintiff was only willing to help defendants (a) secure appropriate cross-default provisions and (b) "work with

[defendants] in attempting to get [the] lender to modify or address our concerns in the inter-creditor agreement." Id. It was reiterated that defendants were "being asked to conform to conditions which are well outside the parameters delineated in the original Term Sheet." Id. It also was restated that defendants' three main objections to proceeding with the deal were: 1) the financing being obtained by plaintiff in the amount of $4.5 million far exceeded the "originally contemplated $3.25 million" needed to consummate the transaction, 2) participation in the inter-creditor agreement would "severely limit, if not totally discard, [defendants'] remedies in the event of a default by [plaintiff], and 3) the parties had not yet been able to agree mutually on a final asset purchase agreement. Id. It was asserted that the "Term Sheet is not an enforceable binding agreement between the parties," and plaintiff was asked to submit a new offer by August 7, 2009. Id.

Plaintiff declined to further negotiate with defendants and defendants thereafter notified plaintiff that they believed they had no choice but to sell the assets and property of Reagents and C.W. Holdings to a third-party. Plaintiff filed a complaint on August 21, 2009, alleging breach of contract and requesting preliminary and permanent injunctive relief to prevent defendants from selling to the third-party.

Plaintiff alleges that the deal was proceeding forward until the appraisal was received, and at that point defendants objected to plaintiff's financing because they realized they made a "bad deal." Plaintiff explains that the loan from the bank, particularly the line of credit that exceeded the purchase price, was necessary for it to operate the business and that defendants agreed to subordinate their Seller Note "to any bank financing needed to consummate the transaction." Defendants counter that they never agreed to subordinate their seller note to bank financing in *excess* of the purchase price or become a party to plaintiff's negotiations with the bank. From defendants' perspective, they attempted to go forward with the sale, but because they never received any of their requested revisions to the inter-creditor agreement, the parties were simply unable to reach the final agreement contemplated by the Term Sheet.

6

Plaintiff contends that the requirements for injunctive relief have been satisfied. From its perspective the parties intended to and did create an enforceable contract under North Carolina law and the Term Sheet reflects "a complete recitation of all the material and essential terms of their agreement." Plaintiff's Brief in Support (Doc. No. 9) at 8. Plaintiff performed all of its obligations under the Term Sheet by depositing $300,000 in escrow, conducting environmental assessments and appraisals of the real estate, obtaining third-party financing, and completing its due diligence investigation of Reagents and C.W. Holdings. Id. at 2. The transaction involved the acquisition of an existing business and real estate used in the industry in which plaintiff conducts business. Thus, it presented a unique business opportunity that cannot be replicated and supports a claim for specific performance. Id. at 9-11. Finally, defendants purportedly cannot be harmed by performing an agreement which they already agreed to perform and granting relief is in the public interest because doing so will promote the enforcement of contracts. Id. at 12.

Defendants maintain that the parties never reached agreement on all material terms necessary to consummate the transaction reflected in the Term Sheet. Their understanding that the Term Sheet was merely a prelude to a more comprehensive agreement is evidenced by the numerous areas of negotiation that surfaced during the parties' ongoing efforts to craft an asset purchase agreement. Furthermore, the ongoing exchanges of drafts of that document demonstrate that there were numerous material terms that had to be worked out, including the specific terms governing the seller financing, the nature of defendants' security in the real estate, the ramifications and applicable remedies in the case of default, defendants' rights to assign the seller note, insurance and indemnity obligations among the parties and so forth. The parties' lack of agreement about all material terms came to the forefront when plaintiff revealed that it was borrowing $4.5 million and defendants would be required to subordinate their note to a loan that was $1.25 million beyond the transaction set forth in the Term Sheet. In addition, the requirements being imposed by plaintiff's bank were in contravention to or rendered inoperative various key provisions outlined in the Term Sheet or implicitly flowing from the terms utilized

therein.  Thus, the parties had not reached agreement on all material terms or lacked mutuality of understanding on those terms.  In the alternative, defendants assert that reaching an acceptable asset purchase agreement was a condition precedent to performance of any actual agreement embodied in the Term Sheet, and that condition precedent remains unsatisfied.  Similarly, plaintiff's failure to address the deviations from the Term Sheet introduced by the inter-creditor agreement places plaintiff in breach of any enforceable agreement.

Requests for injunctive relief invoke the court's equitable discretion.  Resolving such motions requires a delicate balance of equitable factors.  Requests for injunctive relief are to be resolved on a case-by-case basis.  There are four general requirements: the moving party must (1) produce evidence sufficient to convince the court that in absence of the relief requested imminent irreparable injury will result; (2) establish a likelihood of success on the merits; (3) demonstrate that granting the relief will not result in greater harm to the other party; and (4) establish that granting the relief will be in the public interest.  Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1985); Campbell Soup Co. v. Conagra, Inc., 977 F.2d 86, 90-91 (3d Cir. 1992); ERCI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) (citing SI Handling Systems, Inc., v. Heisley, 753 F.2d 1244, 1254 (3d Cir. 1985)).  All of the above factors are balanced with regard to any final decision and the strength of any one factor may affect the necessary showing with regard to another.  Marxe v. Jackson, 833 F.2d 1121, 1128 (3d Cir. 1987).

Defendants conceded at the hearing that a contract to purchase a main competitor's business operations and the commercial real estate used in conjunction therewith can constitute a unique commercial transaction that may entitle a party to specific performance.  Thus, if there is an enforceable contract, the irreparable harm requirement is not in serious dispute.  Consequently, this factor weighs in favor of plaintiff's request for relief.

Conversely, plaintiff has failed to demonstrate a likelihood of success on the merits.  The ruling on defendants' motion to dismiss was premised on two key tenants: (1) "[t]he allegations of the complaint set forth a plausible showing that the material elements of the transaction were

8

present" and (2) plaintiff is entitled to discovery under the standard governing pleadings because it is plausible that extrinsic evidence produced in discovery may reveal an understanding of the parties concerning the subordination clause that would remove the impediments defendants highlight in conjunction with enforcement of the Term Sheet. The ruling on defendants' motions to dismiss was governed by the Twombly plausibility standard. Evaluation of the injunctive relief requirement of a potential for success on the merits requires a showing that such success is likely. The record falls short of this mark.

North Carolina law governs the parties' transaction. Term Sheet at 4. "The elements [for a claim] of breach of contract are (1) the existence of a valid contract and (2) breach of the terms of the contract." Long v. Long, 588 S.E.2d 1, 4 (N.C. App. 2003).

North Carolina's rules on contract interpretation are well-settled. "Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution." Lane v. Scarborough, 200 S.E.2d 622, 624 (N.C. 1973). "To ascertain the parties' intent, which is '[t]he heart of a contract,' the court looks at 'the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time.' " Cowell v. Gaston Cty., 660 S.E.2d 915, 918 (N.C. App. 2008) (quoting Motor Co. v. Insurance Co., 63 S.E.2d 538, 540-41 (1951)), disc. review denied, 672 S.E.2d 687 (2009). When the parties define a term in the contract, the definition of that term is the meaning which must be given to it wherever it appears. State v. Philip Morris USA Inc., 685 S.E.2d 85, 91 (N.C. 2009). In contrast, "any undefined, nontechnical word is "given a meaning consistent with the sense in which [it is] used in ordinary speech, unless the context clearly requires otherwise." Id. (quoting Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co., 172 S.E.2d 518, 522 (N.C. 1970)).

Plaintiff's position on the merits is strained at two critical points. First, the notion that the parties had only minor differences to work out in structuring the asset purchase agreement is not supported by the record. Plaintiff's contention that all material terms were spelled out with

sufficient particularity in the Term Sheet is premised on the contention that only minor matters had to be worked out in order to reach an acceptable asset purchase agreement and the parties virtually had done so prior to the appraisal being completed. The record suggests that the parties had many differences over material terms that came to the surface during the ongoing exchanges of drafts. Beranek testified that he made changes to defendants' initial draft and when he did not hear anything he assumed his proposed changes were acceptable. But Labchem's initial counter-version of June 4, 2009, interjected issues involving the identity of the purchaser, prepayment of the seller's note, the offset of indemnity claims, subsequent changes in ownership of the buyer, insurance among the parties, and indemnity obligations. Additional changes were then made by LabChem on July 7, 2009, to the Balloon Note and Deed of Trust that had been prepared by the sellers as part of the seller financing portion of the transaction outlined in the Term Sheet. From that point forward the focus shifted to those changes and the parties never returned to the task of resolving their differences concerning the terms of the asset purchase agreement.

Assuming the Term Sheet was an enforceable agreement, one of its principal terms was that the parties be able to reach agreement as to the terms of an asset purchase agreement. The process to be used as outlined in the Term Sheet was that the asset purchase agreement was to be drafted by the sellers' attorney, reviewed by the buyer's attorney, reflect the material terms of the Term Sheet, and address any additional requirements "for a transaction of this nature based on the results of due diligence (below) as mutually agreed to by seller and buyer." This provision obligated the parties to proceed in good faith in an effort to reach mutual agreement as to the terms that ultimately would govern the sale of the ongoing business and real estate. While the parties initially embarked on this process, they never completed it due to both the areas of disagreement that surfaced during the exchange of drafts and the interjection of additional issues by plaintiff's banker. Thus, it appears that the parties were unable to complete this material and essential aspect of structuring a final agreement.

Moreover, the terms being imposed by the inter-creditor agreement appear to be material changes that were beyond the contemplation of the parties when they entered the transaction governed by the Term Sheet. Most notably, the transaction to be effectuated by the Term Sheet was to be governed by the laws of North Carolina. The inter-creditor agreement jettisoned that term and required sellers to have their seller financing documents and corresponding rights be governed by the laws of Pennsylvania. Sellers had to waive any right to jury trial that they had under North Carolina law and submit to exclusive jurisdiction in Pennsylvania. Thus, the inter-creditor agreement mandated a change of state law, the waiver of any right to jury trial and submission to exclusive jurisdiction in a state different than the one identified as providing the law controlling the transaction. In addition, the buyer was to receive $4.5 million in financing, which was $1.25 million above the transaction outline in the term sheet. Pursuant to the inter-creditor agreement LabChem's bank had cart-blanche authority to modify the terms of the senior financing and to increase the senior debt without regard to the effects such measures would have on any junior creditors such as defendants.

While it has been determined that it is plausible that plaintiff may be able to show that the above changes were within the contemplation of the parties at the time the Term Sheet was executed, it is likely that they will be determined to be material changes that were not within the purview of the parties at the time the Term Sheet was executed. Plaintiff places much emphasis on the term "any" in the provision of the Term Sheet providing: "[t]he Seller Note will be subordinated to *any* bank debt financing needed by Buyer to consummate the transaction." Term Sheet at 1 (emphasis added). But without more, such reliance appears likely to be misplaced because placing the accent on the term "any" tends to ignore or downplay the phrase that follows and places limitations on the financing: "financing needed . . . to consummate the transaction." The transaction was described in detail by the parties, and it is limited to the purchase price of $2.3 million for all assets, to be paid by $1.25 million at closing and a seller's note in the amount of $1.05 million and $2 million at closing for the real estate as adjusted based

on the appraisal. Nowhere does the description of the transaction contemplate or identify additional amounts to be financed for a line of credit or as a reserve for business operations. If the parties had that in mind one would expect to see language to the effect of "financing needed by Buyer to consummate the transaction and operate any surviving entity." Thus, the additional $1.2 million interjected at the insistence of plaintiff's bank appears to be a material term beyond the framework contemplated by the Term Sheet.

Similarly, the ability to modify or increase the amount of the senior loan without input from any junior creditor appears to be a material change in terms beyond the contemplation of the parties. The natural assumption would appear to be that when one enters into a transaction as a creditor, the rights of the parties are defined and cannot be changed to the further detriment of any of the parties involved. The unilateral right of plaintiff's bank to modify the terms of financing or increase the amount of the senior debt appears to be a material change in terms beyond the contemplation of the parties.[1] The bank representative's recitation of the "golden rule" merely adds credence to the proposition that the terms of the inter-creditor agreement materially expanded the transactional agreement outlined in the Term Sheet.

The tenor of the transaction set forth in the Term Sheet obligated the parties to work through any issues that arose in the course of implementing the understanding reflected in the Term Sheet. Each party was obligated to approach all arising issues in good faith and attempt to find mutually satisfactory solutions. Plaintiff seeks to establish that defendants withdrew from this process once the appraisal revealed that the real estate was worth about $300,000 more than

---

[1]In addition, the inter-creditor agreement had significant implications on defendants' rights as a secured creditor pursuant to the balloon note. First, it eliminated defendants' ability to modify the note or assign any rights under it without the bank's permission. Defendants were also prohibited from selling or transferring the note without the assignee becoming a party to the inter-creditor agreement. It also mandated that if plaintiff ever filed bankruptcy, the debt to the bank had to be paid in full before any payments could be made to defendants. It required defendants to hold any payments they received in a trust for the bank's benefit if the bank did not receive payments from plaintiff, and required defendants to assign all of their rights to such payments to the bank.

the parties had contemplated. And plaintiff must be given the benefit of discovery in seeking to establish this factual proposition.

But at this juncture there is no evidence that defendants failed to proceed in good faith toward resolving the issues that had arisen in crafting an asset purchase agreement and acceptable documents involving the financing. Plaintiff's only support for this proposition is that defendants' concern over the provisions interjected by the inter-creditor agreement came to light after the appraisal was obtained. Such reasoning appears to be a form of *post hoc ergo propter hoc*. There is no evidence that defendants actually contemplated plaintiff acquiring financing far beyond the transaction outlined in the Term Sheet. Nor is there any basis to infer that the parties had such an understanding beyond plaintiff's emphasis on the term "any" in the provision appearing in the Seller Notes section of the Term Sheet, which without more appears to be an ambiguity generated by an unnatural accent on that term and an unnatural reading of the provision when it is placed in context by examining the Term Sheet as a whole.

Given the lack of evidence or supported inference that defendants failed to exercise good faith in seeking to carry out the transaction outlined in the Term Sheet, the issue is raised as to the nature and duration of defendants' obligations after an impasse was reached and the parties were unable to move forward. In this regard it is likely that the rights and obligations reflected in the Term Sheet expired under North Carolina law.

As a general rule, the language of a contract should be interpreted as written. Kroger Ltd. P'ship v. Guastello, 177 N.C. App. 386, 390, 844 (2006). However, it is well settled that absent a time-is-of-the-essence clause, North Carolina law "generally allows the parties [to a real estate purchase agreement] a reasonable time after the date set for closing to complete performance." Fletcher v. Jones, 314 N.C. 389, 393 (N.C. 1985) (citing Scarborough v. Adams, 264 N.C. 631, 142 S.E.2d 608 (1965)). With respect to real estate sales contracts, it has long been held that in the absence of a "time is of the essence" provision, time is not of the essence, the dates stated in

an offer to purchase and contract agreement serve only as guidelines, and such dates are not binding on the parties. Harris v. Stewart, 193 N.C. App. 142, 146 (N.C. Ct. App. 2008).

Two North Carolina cases on this point are illustrative. In Gaskill v. Jennette Enters., Inc., 147 N.C. App. 138 (2001), a contract for the sale of real property was subject to the condition that the buyer obtain financing by a certain date. Id. The buyer obtained a loan commitment after the deadline specified for the financing contingency, but prior to the date specified for closing. Id. at 139. The seller thereafter refused to close. Id. The appellate court could not hold as a matter of law that time was of the essence with respect to the pre-closing deadline where it was ambiguous whether the time is of the essence language applied to the pre-closing condition. The court found that the seller was obligated to perform under the contract. Id. See also Wolfe v. Villines, 169 N.C. App. 483, 489 (2005) ("As time was not of the essence in the contract, the failure to complete the required survey and close by 31 January 2002 does not vitiate the contract. The question rather is one of the reasonableness of the time to complete the contract."). And, in Mezzanotte v. Freeland, 20 N.C. App. 11 (1973), a seller refused to close on a contract where the buyers failed to secure a loan from North Carolina National Bank (NCNB) as the contract specified and tender performance within the required time limits. Id. at 20. The sellers argued that they were thereby relieved from any obligation to perform under the contract. Id. However, the court found that plaintiffs had obtained other financing within a reasonable time and the failure to acquire financing through NCNB was not detrimental to the interests of the sellers; the sellers were therefore required to perform under the contract as they had agreed. Id.

In contrast, North Carolina law recognizes that there does come a point in time when a party's tender would be too late, and "[a]t that time the legal duties of the two parties will be simultaneously discharged." 3A Corbin on Contracts, supra, at 178. As the North Carolina Supreme Court noted in Fletcher:

> When time is not of the essence, the date selected for closing can be viewed as 'an approximation of what the parties regard as a reasonable time under the circumstance of

14

the sale. The vendor [has] a right to expect that the vendees would be ready *about* that time. The vendees, on the other hand, are under an obligation to make the necessary efforts to consummate their purchase within the period they had agreed upon.

Fletcher, 314 N.C. at 393-94 (quoting Drazin v. American Oil Company, 395 A. 2d 32, 34 (D.C. Ct. App. 1978)).

Here, the Term Sheet does not contain a time-is-of-the-essence clause, so the parties were obligated to close within a reasonable time. As the Term Sheet specifies, plaintiff had "60 days to complete [due diligence] and declare the ability to close subject to the Closing Conditions [of the Term Sheet]." Term Sheet at 2. Plaintiff was also required to "identify any condition that [would have prevented it] from closing within such 60 day period." Id. After plaintiff conducted its due diligence the parties were unable to reach a mutually satisfactory agreement to complete the transaction outlined in the Term Sheet. Plaintiff never came forward with an actual tender of financing that was limited to the transaction set forth in the Term Sheet. Had plaintiff modestly gone beyond this 60 day period and then obtained the financing to complete the transaction as originally contemplated by the parties, the finder of fact could conclude that plaintiffs acted within a reasonable time and "made the necessary efforts to consummate [the] purchase within the period [the parties] had agreed upon." Drazin, 395 A. 2d at 34. But the only type of financing tendered by plaintiff appears to have interjected material terms that at this juncture appear to be beyond the transaction contemplated by the parties. And there is no competent proof that plaintiff could have obtained other financing in line with transaction outlined in the Term Sheet.[2]

Moreover, there is no evidence that defendants withdrew from the negotiation process in bad faith or for nefarious reason(s). Thus, when the parties were unable to bridge the differences

---

[2]Beranek testified that although plaintiff had contacted the bank about the problems defendants had with the inter-creditor agreement, the bank was unwilling to eliminate the agreement altogether. Garnett testified that defendants never received any change in the bank's position and defendants' only option essentially was to acquiesce to the terms of the agreement.

that arose over the terms being imposed by plaintiff's bank and the number of other divides that had arisen during the parties' efforts to draft an asset-purchase agreement – all of which arose through no fault of any party, the obligations of the parties under the Term Sheet expired within a reasonable period of time, which the parties agreed was somewhere around sixty days after plaintiff completed its due diligence.

It follows that plaintiff has failed to show a likelihood of success on the merits. This failure significantly influences the other factors taken into account in the balancing equation: namely demonstrating that granting the relief will not cause greater harm to the other party and doing so is in the public interest. Accordingly, a balancing of the factors governing equitable relief does not weigh in favor of granting injunctive relief.

For the reasons set forth above, plaintiff's motion for preliminary injunction will be denied. An appropriate order will follow.


Date: June 11, 2010

                                        s/ David Stewart Cercone
                                        David Stewart Cercone
                                        United States District Judge

cc:      Steven M. Reinsel, Esquire
          Justin T. Barron, Esquire
          Leech, Tishman, Fuscaldo & Lampl
          Citizens Bank Building, 30th Floor
          525 William Penn Place
          Pittsburgh, PA 15219

          Adam S. Barsotti, Esquire
          Barsotti Law Office
          8601 Old Perry Highway
          Pittsburgh, PA 15237

          Rex C. Morgan, Esquire
          Baucom Claytor Benton Morgan and Wood
          1351 East Morehead Street, Suite 200
          P. O. Box 35246
          Charlotte, NC 28235